STATE OF CONNECTICUT *v.* ANTONIO OSMAN
(6745)

SPALLONE, DALY and BERDON, Js.

Argued September 21, 1989—decision released April 24, 1990

*Laura P. Gordon* and *Dana E. Shaw,* certified legal interns, with whom were *Timothy H. Everett* and, on the brief, *Michael R. Sheldon* and *Todd D. Fernow,* for the appellant (defendant).

*Mitchell S. Brody,* assistant state's attorney, with whom, on the brief, were *John M. Bailey,* state's attorney, and *Warren Maxwell,* assistant state's attorney, for the appellee (state).

DALY, J. On trial to a jury, the defendant was convicted of the crimes of robbery in the first degree in violation of General Statutes § 53a-134 (a) (3), and of conspiracy to commit robbery in the first degree in vio-

lation of General Statutes §§ 53a-48 and 53a-134 (a) (3). He appeals from the trial court's refusal to set aside the jury verdict and render judgment of acquittal on both counts. His appeal is based on two alternative claims: That the evidence was insufficient to identify him as a participant in the robbery; and that the pellet gun used in the robbery was not a dangerous instrument as defined by General Statutes § 53a-3 (7).

The jury could reasonably have found the following facts, among others. On the night of May 11, 1986, two masked males robbed a convenience store in Manchester. The first robber, wearing a clown mask and carrying a pellet gun, leaped over the cashier's counter and ordered the store clerk to open the cash register and the safe. The second robber, wearing a red scarf over his face and carrying a tire iron, approached the store clerk's husband and ordered him to lie facedown on the floor. The robbers took approximately $100. The clerk and her husband were not injured.

The store clerk and her husband provided the jury with profiles of the robbers through their testimony at trial. The first robber was between 5'6" and 5'8" tall and slight of build. The second robber was about two inches taller than the first. The first robber wore a clown mask that was bald on top with red hair sticking out on the sides. He also wore grey sweat pants. The pellet pistol he carried was black with a brown handle and a screw at the bottom of the handle.

A police investigation linked the defendant to the robbery. The defendant and a close friend lived in the same neighborhood, approximately two miles from the convenience store that was robbed. The defendant is approximately two inches shorter than his friend, who is nearly six feet tall. The defendant often wore grey sweat pants. The defendant had a pellet pistol similar

to the one used in the robbery, which he turned over to the police before his arrest.

At trial, the state's witnesses produced testimony that further linked the defendant to the robbery. The mother of the defendant's friend testified that, about one month before the robbery, she discovered a pellet pistol in her apartment and, after her son told her that the pistol belonged to the defendant, she ordered her son to return it. She also testified that her son brought home an expensive stereo, leather jacket and leather sneakers and seemed to have money although he was unemployed. Other witnesses testified that the defendant possessed a pellet pistol and a Halloween costume prior to the robbery. Also, the defendant and his friend were heard asking for money on the day of the robbery.

I

The defendant first claims that the state's evidence was insufficient to identify him as a participant in the robbery. Among the essential elements of the crimes charged, which the state had the burden of proving beyond a reasonable doubt at trial, is the identification of the defendant as the first robber. *State* v. *Jackson,* 176 Conn. 257, 258, 407 A.2d 948 (1978).

Our standard of review is well settled when the sufficiency of the state's evidence is challenged after a conviction. We first construe the evidence in the light most favorable to sustaining the verdict. On the basis of this view of the evidence, we then determine whether the jury could reasonably have found guilt beyond a reasonable doubt. *State* v. *Braxton,* 196 Conn. 685, 691, 495 A.2d 273 (1985).

Our role is to determine whether the jury could have logically reached its conclusion from the facts shown. The jury must find guilt beyond a reasonable doubt by using the evidence to exclude every reasonable hypothe-

sis of the defendant's innocence, but it need not exclude every possible supposition of innocence no matter how implausible. *State* v. *Foord,* 142 Conn. 285, 295, 113 A.2d 591 (1955). The jury may draw reasonable inferences from the proven facts, but must not resort to speculation. *State* v. *Gaynor,* 182 Conn. 501, 503, 438 A.2d 749 (1980).

If we find that there is sufficient evidence to enable the jury to find guilt beyond a reasonable doubt without resorting to speculation, the conviction must stand. We must not invade the province of the jury by weighing the evidence or by resolving questions of the credibility of witnesses. *State* v. *Cobbs,* 203 Conn. 4, 6–7, 522 A.2d 1229 (1987). "We do not sit as a thirteenth juror who may cast a vote against the verdict based upon our feeling that some doubt of guilt is shown by the cold printed record." *State* v. *Stepney,* 191 Conn. 233, 255, 464 A.2d 758 (1983), cert. denied, 465 U.S. 1084, 104 S. Ct. 1455, 79 L. Ed. 2d 772 (1984).

In the case before us, it is of no moment that the eyewitnesses were unable to identify the defendant as a participant in the robbery. The state's case was necessarily based on circumstantial evidence because the robbers wore masks. There is no difference in the degree of the probative force of direct evidence versus circumstantial evidence. Id. However, because "the force and effect of circumstantial facts usually, and almost necessarily, depend upon their connection with each other"; *Moore* v. *United States,* 150 U.S. 57, 61, 14 S. Ct. 26, 37 L. Ed. 996 (1893); we recognize that "[i]t is not one fact, but the cumulative impact of a multitude of facts which establishes guilt in a case involving substantial circumstantial evidence." *State* v. *Cimino,* 194 Conn. 210, 211, 478 A.2d 1005 (1984).

The cumulative impact of the evidence in this case was sufficient to enable the jury to conclude beyond

a reasonable doubt that the defendant participated in the robbery. The defendant and his friend fit the description of the robbers. They lived within two miles of the crime scene. The mother of the defendant's friend gave testimony that strongly suggested that the two were involved in illegal activity. The defendant was in possession of a pellet pistol similar to the one the store clerk and her husband described. He also possessed some sort of Halloween costume with red hair on it, similar to the red hair on the clown mask the first robber wore. Finally, the defendant and his friend tried to borrow money on the day of the robbery.

The fact that witnesses gave inconsistent descriptions of the robber's mask and the defendant's costume does not mean that the evidence in this case was insufficient. The jury may reasonably overlook inaccuracies in testimony that are within the range of human error. *State v. Cates,* 202 Conn. 615, 628 n.4, 522 A.2d 788 (1987). "Whether there seems to be contradiction between different witnesses or confusion in the testimony, it is precisely this type of factual conflict that Anglo-American jurisprudence has traditionally entrusted to the jury." *State* v. *Gaynor,* supra, 504; *State* v. *Moore,* 3 Conn. App. 503, 504, 489 A.2d 1069 (1985); *State* v. *Nelson,* 38 Conn. Sup. 374, 376, 448 A.2d 219 (1982). The store clerk and her husband testified that the robber wore a clown mask, bald on top with red hair on the sides. Another witness stated that she saw the defendant at a party one month before the robbery with a costume, which she described as an old man's hat with red hair sticking out. Given that each description contained the distinct feature of red hair, the jury could reasonably have overlooked other inconsistent aspects of the descriptions.

Viewing the evidence in the light most favorable to sustaining the verdict, we conclude that there was suf-

ficient evidence for the jury to conclude beyond a reasonable doubt that the defendant participated in the robbery.

## II

The defendant's second claim is that the court erred in denying his motion for judgment of acquittal because the evidence was insufficient to prove that the pellet gun used in the robbery was a dangerous instrument, as defined in General Statutes § 53a-3 (7).[1] This claim relates only to the defendant's conviction on the first count of first degree robbery in violation of General Statutes § 53a-134 (a) (3). In denying the defendant's motion for judgment of acquittal on the first count, the trial court reasoned that, although the state did not prove that the pellet pistol was loaded at the time of the robbery, the conviction could be sustained on the ground that the pellet pistol was a dangerous instrument because it could have been used as a bludgeon. This reasoning was erroneous, however, because all of the evidence adduced at trial showed that the defendant did not threaten to bludgeon the victims, although he did threaten to shoot them.

Because there was no evidence that the defendant threatened to use the pistol as a bludgeon, the verdict on the first count can be sustained only on the assump-

---

[1] The jury's verdict on the first count cannot be sustained on the ground that another participant in the robbery threatened the use of a dangerous instrument. See General Statutes § 53a-134 (a) (3). This is true despite the fact that the store clerk's husband testified at trial that the second robber threatened him with a tire iron. The long form information charges only that the defendant personally threatened the use of a dangerous instrument and does not also charge that he participated in a robbery in which another participant threatened the use of a dangerous instrument. "[T]he state is limited to proving that the defendant has committed the offense in substantially the manner described." State v. Belton, 190 Conn. 496, 501, 461 A.2d 973 (1983); quoting State v. Ruiz, 171 Conn. 264, 270, 368 A.2d 222 (1976).

tion that an unloaded pellet pistol is a dangerous instrument under § 53a-134 (a) (3). In this regard, it is important to understand the origin of the distinction made in the penal code between deadly weapons and dangerous instruments. Under prior law, weapons were distinguished based on whether they were designed to do violence. A weapon designed for the sole purpose of doing violence was considered deadly per se (by or through itself). The law recognized that ordinary objects, not designed or manufactured for violence, could also be deadly, depending on the actual manner in which they are used. Thus, ordinary objects could be considered deadly weapons under the law, even though they are not deadly per se. See *State* v. *Litman,* 106 Conn. 345, 352–53, 138 A. 132 (1927).

Our modern penal code preserves, to a great extent, the distinction between those weapons that are deadly per se and those that are not.[2] General Statutes § 53a-3 (6) defines "deadly weapon" and § 53a-3 (7) defines "dangerous instrument." The term deadly weapon is confined to those items designed for violence. The concept of a dangerous instrument, on the other hand, focuses on the manner in which an object is used or attempted or threatened to be used, and its capabilities under these circumstances. See Commission to Revise the Criminal Statutes, 1971 comments, p. 3.

[2] Under General Statutes § 53a-3 (6), firearms are deadly per se, whether loaded or unloaded. This provision expressly exempts §§ 29-38 and 53-206 from its coverage. The latter two statutes apply to carrying firearms on one's person or in one's motor vehicle. Unloaded firearms are not deadly per se under those statutes. *State* v. *Scully,* 195 Conn. 668, 677, 490 A.2d 984 (1985). The reason for these exemptions is that "the unloaded rifle or shotgun cannot be deemed per se 'deadly weapons' when transported in a motor vehicle; otherwise, even those with legitimate reasons for possessing an unloaded firearm in a motor vehicle, e.g., a hunter, would fall within the sweep of those provisions." Id., 678 n.13. Outside of these two statutory exemptions, however, unloaded firearms are per se deadly, and this conforms with prior law. See *State* v. *Reed,* 157 Conn. 464, 468, 254 A.2d 449 (1969).

The fact that the legislature intended the term dangerous instrument to apply only to those weapons that are not deadly per se is reflected in our case law. The cases interpreting the term dangerous instrument all involve ordinary objects that are actually used or threatened to be used in ways that would likely cause death or serious physical injury. *State* v. *Killenger,* 193 Conn. 48, 54, 475 A.2d 276 (1984) (hammer or flashlight); *State* v. *Grant,* 177 Conn. 140, 411 A.2d 917 (1979) (tire iron); *State* v. *Jones,* 173 Conn. 91, 376 A.2d 1077 (1977) (hockey stick); *State* v. *Vuley,* 15 Conn. App. 586, 545 A.2d 1157 (1988) (pipe); *State* v. *Ortiz,* 14 Conn. App. 493, 504, 542 A.2d 734 (1988) (stick); *State* v. *Frazier,* 7 Conn. App. 27, 39–40, 507 A.2d 509 (1986) (key); *State* v. *Levine,* 39 Conn. Sup. 494, 497–98, 466 A.2d 814 (1983) (garden hose).

Under § 53a-134 (a) (3), the state had the burden of showing that, under the circumstances in which the pellet pistol was used, it was actually capable of causing death or serious physical injury. *State* v. *Grant,* supra, 146 n.5. The defendant threatened to shoot the store clerk, but did not threaten to bludgeon her. Under these circumstances, an unloaded pellet pistol is not a dangerous instrument. Because the state failed to prove that the pistol was loaded during the robbery, there is error as to the first count in the trial court's denial of a judgment of acquittal.[3]

---

[3] The defendant in the present case could have been charged with first degree robbery under either General Statutes § 53a-134 (a) (2) or § 53a-134 (a) (4). The pellet pistol used in the robbery is a weapon designed for violence. The weapon fits the definition of the term "deadly weapon" at § 53a-3 (6). This term appears in § 53a-134 (a) (2). The weapon also fits the definition of "firearm" in § 53a-3 (19). This term appears in § 53a-134 (a) (4). If the defendant had been charged under either of these sections, the state would not have had to prove that the pistol was loaded at the time of the robbery. The only issue would have been whether the weapon was operable. See *State* v. *Hawthorne,* 175 Conn. 569, 572, 402 A.2d 759 (1978); *State* v. *Aleksiewicz,* 20 Conn. App. 643, 569 A.2d 567 (1990). The fact that the state may well have offered evidence sufficient

The evidence was sufficient, however, to sustain a conviction for third degree robbery, in violation of General Statutes § 53a-133. Third degree robbery is a lesser offense included in the crime of first degree robbery. See State v. Whistnant, 179 Conn. 576, 588, 427 A.2d 414 (1980). Under Practice Book § 899, if the judicial authority directs an acquittal for the offense specified in the verdict, but not for a lesser included offense, he or she may modify the verdict accordingly. On the basis of the charging documents, we find that the defendant had sufficient notice that he would be exposed to possible conviction on the lesser included offense of third degree robbery in the first count. State v. Jacobowitz, 182 Conn. 585, 591, 438 A.2d 792 (1981); State v. Hudson, 14 Conn. App. 472, 476–77, 541 A.2d 539 (1988). The state requested and received a jury instruction on the lesser included offense in the first count. We conclude that the jurors would necessarily have found the defendant guilty of the lesser charge, had they considered it. See State v. Aleksiewicz, 20 Conn. App. 643, 650–51, 569 A.2d 567 (1990).

### III

The defendant next claims that the trial court erred in denying his motion for judgment of acquittal on the second count for the charge of conspiracy to commit first degree robbery.[4] " 'The commission of the substantive offense and a conspiracy to commit it are separate and distinct crimes.' " In re Luis R., 204 Conn. 630, 637, 528 A.2d 1146 (1987). " ' "To establish the crime of conspiracy under Section 53a-48 of the Gen-

to warrant a conviction for first degree robbery under either of the two sections is immaterial, however, because the defendant was not charged under those sections. State v. Palkimas, 153 Conn. 555, 563, 219 A.2d 220 (1966); State v. Kristy, 11 Conn. App. 473, 481, 528 A.2d 390, cert. denied, 206 Conn. 801, 535 A.2d 1315 (1987).

[4] One ground upon which this claim is based is that there was, according to the defense, insufficient evidence to identify the defendant as a participant in the robbery. We have already held that the evidence was sufficient.

eral Statutes, the state must show that there was an agreement between two or more persons to engage in conduct constituting a crime and that the agreement was followed by an overt act in furtherance of the conspiracy by any one of the conspirators." . . .' " (Citations omitted.) *State* v. *Rouleau,* 204 Conn. 240, 258, 528 A.2d 343 (1987). Conspiracy is a crime of the same grade and degree as the most serious offense that is the object of the conspiracy. General Statutes § 53a-51. On appeal, this court construes the evidence "in the manner most favorable to sustaining the verdict." *State* v. *Gunning,* 183 Conn. 299, 309, 439 A.2d 339 (1981).

The uncontroverted evidence that the second robber wielded a tire iron sufficed to support the jury's conclusion that the two robbers conspired to commit first degree robbery. See *State* v. *Ghere,* 201 Conn. 289, 299–300, 513 A.2d 1226 (1986). Under the circumstances, the tire iron clearly was a dangerous instrument under General Statutes § 53a-134 (a) (3). See *State* v. *Grant,* supra.

The defendant argues that the conviction for conspiracy to commit first degree robbery cannot stand because the state amended the long form information before submitting it to the jury and because the court did not recount all the elements of first degree robbery when instructing the jury on the second count. We find these claims to be without merit.

The information originally charged the defendant in the second count with conspiracy to commit "robbery in the first degree" in violation of General Statutes §§ 53a-48 and 53a-134 (a) (3). The second count was subsequently amended pursuant to Practice Book § 624 to charge the defendant with conspiracy to commit "robbery." The reference to § 53a-134 (a) (3) was not changed.

An information can be amended under Practice Book § 624 only to charge the defendant with the same crime as in the original information or with a lesser included offense. *State* v. *Jacobowitz,* supra, 590. The state contends that the information was amended to charge the defendant with the same offense, while the defendant argues that the state could have meant only to reduce the charge to the lesser included offense of conspiracy to commit third degree robbery.

The sixth amendment to the United States constitution provides in part: "In all criminal prosecutions, the accused shall enjoy the right . . . to be informed of the nature and cause of the accusation." This provision is implemented by Practice Book § 618, which governs the form of information to be used in felony cases. Section 618 provides in part that "[t]he information shall state for each count the official or customary citation of the statute, rule, regulation, or other provision of law which the defendant is alleged to have violated." "Under our practice, it is sufficient for the state to set out in the information the statutory name of the crime with which the defendant is charged, leaving to the defendant the burden of requesting a bill of particulars more precisely defining the manner in which the defendant committed the offense. Practice Book §§ 495, 498; *State* v. *Davis,* 141 Conn. 319, 106 A.2d 159 [1954]; see *State* v. *Brown,* 163 Conn. 52, 61, 301 A.2d 547 [1972]. Once such a bill of particulars has been filed or where . . . the information is sufficiently precise that no bill of particulars is needed, the state is limited to proving that the defendant has committed the offense in substantially the manner described. *State* v. *Beaulieu,* 164 Conn. 620, 625, 325 A.2d 263 [1973]; *State* v. *DiLorenzo,* 138 Conn. 281, 284–85, 83 A.2d 479 [1951]; *State* v. *Scott,* 80 Conn. 317, 321, 68 A. 258 [1907]; cf. *State* v. *Cari,* 163 Conn. 174, 183–84, 303 A.2d 7 [1972]. In the event the state offers evidence

to prove that the defendant committed an offense in a manner other than that set out in the information and bill of particulars, the trial court may grant the state an amendment to conform the evidence to the information, but must ensure that no prejudice to the defendant results. See *State* v. *Rafanello,* 151 Conn. 453, 456, 199 A.2d 13 [1964]; see also Practice Book § 525." *State* v. *Ruiz,* 171 Conn. 264, 270, 368 A.2d 222 (1976).

The argument of the defendant that the effect of the amendment of the information was to reduce the charge in the second count to conspiracy to commit third degree robbery fails because the state did not change the reference to General Statutes § 53a-134 (a) (3) in that count.[5] Upon the information that the jurors saw, the defendant was charged with conspiracy to commit robbery in violation of General Statutes §§ 53a-48 and 53a-134 (a) (3). They returned their verdict accordingly.

The defendant also contends that the trial court's charge to the jury on the second count was inadequate to apprise the jurors of all of the elements of conspiracy to commit first degree robbery. According to the defendant, the jurors were unaware that the threatened use of a dangerous instrument is an aggravating factor that distinguishes the crime of conspiracy to commit first degree robbery from the offense of conspiracy to commit third degree robbery because the court made no mention of the dangerous instrument element in its charge to the jury on the second count. The defendant concludes that the jury could not have convicted the defendant of a greater offense than conspiracy to commit third degree robbery because it cannot convict an

[5] On August 6, 1986, the defendant motioned for a bill of particulars. That motion does not appear in the appellate record. Nor is there any indication whether the motion was granted or denied. "It is the responsibility of the appellant to provide an adequate record for review." Practice Book § 4061.

accused "without even knowing what are the essential elements of the crime charged." *State* v. *Griffin,* 175 Conn. 155, 162–63, 397 A.2d 89 (1978).

The defendant did not take an exception to the charge to the jury and so we must determine whether to review this claim under the guidelines recently articulated in *State* v. *Golding,* 213 Conn. 233, 239–42, 567 A.2d 823 (1989). In the present case, the defendant has presented arguments that, if correct, would lead to the conclusion that there was a violation of a fundamental constitutional right that clearly deprived the defendant of a fair trial. See id., 241. Moreover, we are persuaded that if the defendant is correct, then the constitutional violation would not be subject to harmless error analysis. We, therefore, address the merits of the claim to determine whether the alleged constitutional violation clearly exists.

" ' " 'The test to be applied to any part of a charge is whether the charge considered as a whole presents the case to the jury so that no injustice will result.' *State* v. *Mullings,* 166 Conn. 268, 275, 348 A.2d 645 [1974]; *Siladi* v. *McNamara,* 164 Conn. 510, 515, 325 A.2d 277 [1973]." *State* v. *Roy,* 173 Conn. 35, 40, 376 A.2d 391 (1977).' *State* v. *Stepney,* 191 Conn. 233, 247, 464 A.2d 758 (1983), cert. denied, 465 U.S. 1084, 104 S. Ct. 1455, 79 L. Ed. 2d 722, reh. denied, 446 U.S. 954, 104 S. Ct. 2163, 80 L. Ed. 2d 547 (1984). It is well established that jury instructions must be read as a whole and that individual instructions are not to be judged in 'artificial isolation' from the overall charge. *Cupp* v. *Naughten,* 414 U.S. 141, 147, 94 S. Ct. 396, 38 L. Ed. 2d 368 (1973); *State* v. *Holmquist,* 173 Conn. 140, 151, 376 A.2d 1111, cert. denied, 434 U.S. 906, 98 S. Ct. 306, 54 L. Ed. 2d 193 (1977). Although the *Cupp* court stated, 'a single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge,' that court also recognized that that 'does

not mean that an instruction by itself may never rise to the level of constitutional error . . . .' *Cupp* v. *Naughten,* supra, 146–47; see *Cool* v. *United States,* 409 U.S. 100, 93 S. Ct. 354, 34 L. Ed. 2d 335 (1972). The due process clause 'protects the accused against conviction except upon proof [by the state] beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged.' *In re Winship,* 397 U.S. 358, 364, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970); accord *Patterson* v. *New York,* 432 U.S. 197, 210, 97 S. Ct. 2319, 53 L. Ed. 2d 281 (1977). . . . [T]he defendant has a constitutional right to have the jury adequately instructed in order to guarantee him a fair trial. Moreover, this right directly implicates the requirement of correct instructions on the standard of proof as well as the burden of proof. A misstatement of the law is more likely to be prejudicial than an omission or incomplete instruction. *Henderson* v. *Kibbe,* 431 U.S. 145, 155, 97 S. Ct. 1730, 52 L. Ed. 2d 203 (1977); *State* v. *Kurvin,* 186 Conn. 555, 563, 442 A.2d 1327 (1982); see *State* v. *Preyer,* 198 Conn. 190, 198–99, 502 A.2d 858 (1985)." *State* v. *Rouleau,* supra, 251–53.

In light of the trial court's entire charge, the argument of the defendant that the jury was not apprised of all of the elements of conspiracy to commit first degree robbery is without merit. In explaining the charges against the defendant contained in the information, the court stated that the defendant was charged in the second count with conspiracy to commit first degree robbery in violation of General Statutes §§ 53a-48 and 53a-134 (a) (3). In its instructions on the first count, the court explained the elements of first degree robbery. The court also gave an instruction on the lesser included offense of third degree robbery, as requested by the state. The court then explained the elements of the crime of conspiracy in its instructions on the second count. The charge as a

whole was sufficient to apprise the jury of all of the elements of conspiracy to commit first degree robbery, and there was nothing in the court's instructions to suggest that the defendant should not be found guilty of conspiracy to commit first degree robbery.

There is error in part; the judgment is set aside as to the first count only and the case is remanded with direction to render judgment of guilty of robbery in the third degree on that first count, and to resentence the defendant accordingly.

In this opinion SPALLONE, J., concurred.

BERDON, J., dissenting in part and concurring in part.

I

The majority charts a dangerous course by allowing the identification of the accused to be established through evidence that is not trustworthy. I have been unable to find any other Connecticut case in which a conviction was upheld on proof of identification based solely upon circumstantial evidence of mere similarities not bolstered by similarities of a distinctive nature that connected the defendant to the crime.

For example, in the following cases the Supreme Court of Connecticut reversed convictions where the identification of the accused was based solely upon circumstantial evidence that did not link the accused to the crime in some distinctive manner: *State* v. *Cobbs,* 203 Conn. 4, 522 A.2d 1229 (1987); *State* v. *Mandrell,* 199 Conn. 146, 506 A.2d 100 (1986); *State* v. *Payne,* 186 Conn. 179, 440 A.2d 280 (1982); *State* v. *Jackson,* 176 Conn. 257, 407 A.2d 948 (1978); *State* v. *Mayell,* 163 Conn. 419, 311 A.2d 60 (1972); *State* v. *Kelsey,* 160 Conn. 551, 274 A.2d 151 (1970). On the other hand, the following convictions were upheld because in each case there was distinctive circumstantial evidence of iden-

tification that connected the accused to the crime. *State* v. *Cates,* 202 Conn. 615, 522 A.2d 788 (1987) (a white mink cape with the victim's initials sewn inside that was similar to the stolen cape found in the defendant's apartment); *State* v. *Braxton,* 196 Conn. 685, 495 A.2d 273 (1985) (the defendant found perspiring profusely and breathing heavily near the scene of a robbery just minutes after it occurred, his car was connected with the robbery as the getaway car and $10 in loose quarters, which was the precise amount contained in the wrapped roll of quarters stolen during the robbery, was found on him); *State* v. *Wilson,* 178 Conn. 427, 423 A.2d 72 (1979) (the defendant found with a distinctive ski mask—triangular nose piece bordered with orange—similar to the one used in the robbery, a gold chain necklace identical to the one taken in the robbery and guns and a gun case stolen in the robbery).

If this case were stripped of all hyperbole,[1] the jury could reasonably have found the following facts per-

---

[1] The majority makes certain claims to "link" the defendant with the crime that are not in evidence or even argued by the state on appeal. First it is claimed (p. 302) that the mother of Scott Ciak, the defendant's friend, testified that "her son told her that the pistol belonged to the defendant . . . ." This hearsay evidence was allowed into evidence, over the objection of the defendant, for a limited purpose and not for the truth of it. The court on admitting the evidence ruled: "I would indicate to the ladies and gentlemen of the jury, the purpose of the question is for—is a limited one and the answer is also limited not as to the truth of the matter stated."

It is also claimed (p. 304) that the "mother of the defendant's friend gave testimony that strongly suggested that the [defendant and his friend] were involved in illegal activity." Ciak's mother did testify that she noticed that her son, who was not gainfully employed for a period prior to the robbery, had possession of "a lot of money" and expensive items of clothing during that period. There was not, however, a scintilla of evidence that the defendant was sporting such wealth. Indeed, the evidence shows that he often wore sweat pants.

Finally, it is claimed (p. 304) the "defendant and [Ciak] fit the description of the robbers." The mere fact that the first robber was described as having been shorter than the second robber just as the defendant is shorter than his friend Ciak, is no basis for drawing this conclusion. Cf. *State* v. *Jackson,* 176 Conn. 257, 407 A.2d 948 (1978). There were in fact substan-

taining to the identification of the defendant. The defendant and Scott Ciak, a friend of the defendant and the person who the state theorizes was the second robber, lived across the street from each other, about two miles from the Cumberland Farm store where the robbery occurred. The defendant is shorter than Ciak just as the first robber was shorter than the second robber. The defendant often wears gray sweat pants just as the first robber wore gray sweat pants. The defendant and Ciak tried to borrow money from friends the afternoon of the robbery, which took place about 9:15 p.m. The defendant had possession of a pellet gun (a Crossman bb gun)[2] several weeks before and after the robbery[3] which he voluntarily turned over to the police during their investigation. The bb gun was identified by Donald Kurapkot, the store clerk's husband and the only witness who could make the identification, as being

tial differences between the description given by the store clerk and her husband and the physical characteristics of the defendant as pointed out in this dissent.

[2] David J. Best, an inspector with the division of criminal justice of the state of Connecticut, testified that the gun obtained from the defendant and identified as being similar to the one used in the robbery was a Crossman model and fired a .177 caliber projectile. It is commonly referred to as a bb gun. Webster, Third New International Dictionary.

[3] The direct evidence fails to establish that the defendant had possession of a bb gun on May 11, 1986, the day of the robbery, which the state claims is one of the linchpins of its case. The state, to support its theory, relies on the testimony of Dawn Fava that she discovered a similar gun when she was moving out of her apartment and that, upon confronting the defendant with the gun, he took it. She testified, however, that she moved out of the apartment "about the end of April" and in the statement taken by the police she said she moved in June or July, 1986. Neither does the testimony of Beth Lane place the bb gun in the hands of the defendant on the day of the robbery. She merely testified that the defendant and Ciak were in Fava's apartment on May 11, 1986, while she was "in the midst of moving out" and made no reference to a gun. Indeed, the state during closing arguments conceded that Fava moved in a "piecemeal fashion out of her apartment." There is no evidence that the defendant had a similar bb gun either immediately preceding the robbery, on the day of the robbery, or immediately following the robbery.

similar, but not identical, to the gun used by the first robber. The commonness of the bb gun is underscored by the fact that Donald Kurapkot was able to identify it only as being similar to the one held by the first robber because his son owned one. Surely, up to this point, the cumulative effect of the foregoing circumstantial evidence could not reasonably lead to the drawing of an inference, beyond a reasonable doubt, that the first robber was the defendant.

The state seeks to bolster its claim with evidence that the first robber wore a distinctive Halloween clown mask and that the defendant was seen at a party with a similar mask. The descriptions of what purported to be the mask varied to such an extent that it would be speculative to conclude that they were similar let alone to draw an inference that it was the same mask. Hedy Kurapkot, the store clerk, described the mask worn by the first robber as a Halloween "clown mask" with red hair "sticking up." Her husband described it as a "clown thing" with red hair and a "bald head thing on top." Beth Lane, the only witness produced by the state to connect the defendant with the mask, testified that approximately one month before the robbery, when she was at a party with the defendant and others, he showed her a costume of "an old man's hat with red hair on it." The evidence does not indicate they were describing the same thing. Clearly, the Kurapkots described a *face mask*, but Lane described a *costume* consisting of an old man's hat. Furthermore, the lapse of one month between the connection of the defendant with what purports to be the robber's mask and the date of the robbery further dilutes this evidence. Even if we assume, however, that they were both face masks, the varied descriptions—that is, "clown" compared to "old man" and "bald" compared to "hat"— make this evidence too tenuous to conclude that they were similar.

Relying upon *State* v. *Cates,* supra, the majority passes off these wide discrepancies by holding that they were well within the range of human error and that the jury could reasonably overlook them. *Cates,* however, does not stand for authority that would allow the trier of fact to reconcile substantial differences by attributing them to mere human error. In *Cates,* the victim described the robber's car as black with the license plate number 595-AYX. The defendant's car was charcoal with the license plate number 595-AXY. Our Supreme Court concluded that "the jury could reasonably have thought that these minor inaccuracies were well within the range of human error." Id., 628 n.4. In the present case, the differences go further than mere inaccuracies in describing the hue and transposing letters on a license plate. The only parts of the descriptions that were the same were that both the costume and mask were described as having red hair. Furthermore, the minor errors in *Cates* must also be viewed in the context that the police found in the defendant's apartment the stolen, white mink cape, which had the victim's initials sewn in it. None of the fruits of the robbery was found in the possession of the defendant. Indeed, the state was unable to produce the mask it claims the defendant wore.

The state's case becomes even more untenable when the circumstantial evidence is viewed with other evidence that would indicate the defendant was not the first robber. The physical descriptions fail to indicate that the defendant and his friend Ciak were the robbers. The store clerk described the first robber as being 5' 6" to 5' 8" tall (her husband thought he was 5' 6" to 5' 7") and as being a "very small, thin man or boy" who she thought was white because of the sound of his voice. She described him as being very "spry," having jumped the four-foot counter during the robbery, and as a fast runner. The defendant is black and the trial

court was requested to take judicial notice that the defendant is approximately 5' 4", 150 lbs. and very stocky. Furthermore, although he was able to walk normally, during the months of April and May, prior to the robbery, the defendant wore a white and blue leg brace. The store clerk and her husband could not identify the race or hair color of the second robber, although his face was covered with only a scarf. Ciak is white, almost 6 feet tall, and has red hair.

The cumulative effect of the circumstantial evidence is insufficient to identify the defendant as being the perpetrator of the robbery beyond a reasonable doubt. The jury must not resort to speculation and conjecture in drawing inferences from circumstantial evidence. *State* v. *Little,* 194 Conn. 665, 671, 485 A.2d 913 (1984). "Inferences to be drawn from the facts proved must be reasonable and logical . . . ." *Palmieri* v. *Macero,* 146 Conn. 705, 708, 155 A.2d 750 (1959); *State* v. *Kelsey,* 160 Conn. 551, 553–54, 274 A.2d 151 (1970). "Moreover, inferences which do not have a basis in facts established by the evidence cannot be drawn or relied on to sustain a verdict." *State* v. *Jackson,* supra, 264. "A conclusion of guilt requires proof beyond a reasonable doubt, and proof to that extent is proof which precludes every reasonable hypothesis except that which it tends to support, and is consistent with the defendant's guilt and inconsistent with any other rational conclusion." *State* v. *Foord,* 142 Conn. 285, 295, 113 A.2d 591 (1955); *State* v. *Little,* supra, 672. "If the evidence is insufficient to sustain the burden of proof beyond a reasonable doubt, the verdict must be set aside." *State* v. *Carpenter,* 214 Conn. 77, 84, 570 A.2d 203 (1990).

I agree with the majority that the court should not sit as a "thirteenth juror" in determining guilt or innocence. The court, however, has an obligation to set the verdict aside when the evidence does not reach the

quantum of proof necessary to establish beyond a reasonable doubt that the defendant was the culprit. "The most formidable barrier to irrational jury verdicts may be that which arises from the court's inherent power to order a judgment of acquittal because the prosecution has failed to present sufficient evidence of guilt." A. Spinella, Conn. Criminal Procedure, p. 708. The "presumption of innocence" and the requirement that the accused's guilt be proven "beyond a reasonable doubt," "symbolize today, as they did in their beginnings, the special place of the accused in our system of criminal procedure. They cast in evocative language the deeply-held feeling that the combination of all-too-fallible witnesses and serious sanctions requires that the sanctions should be imposed only where guilt seems virtually certain." A. Goldstein, "The State and the Accused: Balance of Advantage in Criminal Procedure," 69 Yale L.J. 1149, 1153 (1960).

In my opinion, I would find error as to both counts, set aside the judgments and remand the case with direction to render judgment on each count that the defendant is not guilty and order that he be discharged. Nevertheless, even if there were sufficient evidence to support the identification of the defendant as the first robber, I still would be unable to agree with the majority on the disposition of the first count and the conclusion they reach on the second. Accordingly, I write on these matters in order to express my views.

## II

I concur with the majority that the evidence on the first count in this case was insufficient to prove that the bb gun that the state claims was used in the robbery by the first robber was a dangerous instrument as defined by General Statutes § 53a-3 (7). I disagree, however, that the Appellate Court has jurisdiction to dispose of the case by directing that the defendant be

adjudged guilty of the lesser included offense. Practice Book § 899, on which the majority relies, provides that "[i]f the judicial authority directs an acquittal for the offense specified in the verdict, but not for a lesser included offense, he [or she] may either: (1) [m]odify the verdict accordingly; or (2) [g]rant the defendant a new trial as to the lesser included offense." "Judicial authority" is defined as meaning "the superior court and each judge of the superior court." Practice Book § 1021 (1).

Section 899 was patterned after Rule 551 (b) of the Uniform Rules of Criminal Procedure. The commentary under that uniform rule states: "In the situation specified, the court should grant the defendant a new trial rather than merely modifying the verdict if the error in finding the defendant guilty of the higher offense might have infected the jury's presumed finding of guilt as to the included offense." It is clear that the case should be remanded to the trial court so it can make a determination of whether to render a judgment of guilty on the lesser included offense or order a new trial.

I am aware of *State* v. *McGann,* 199 Conn. 163, 178–79, 506 A.2d 109 (1986); *State* v. *Aleksiewicz,* 20 Conn. App. 643, 569 A.2d 567 (1990); and *State* v. *Horne,* 19 Conn. App. 111, 142–146, 562 A.2d 43 (1989), wherein the appellate courts merely remanded the cases with direction to render judgment of guilty on the lesser included offenses when there was insufficient evidence to support the crimes charged. The simple answer is that the Supreme Court in *McGann* and the Appellate Court in *Aleksiewicz* and *Horne* failed to take into consideration the requirement of § 899. Accordingly, this court is not bound by the precedent of those cases. Cf. *State* v. *DellaCamera,* 166 Conn. 557, 560, 353 A.2d 750 (1974). The rule provides, at least in the first instance, that the trial court is to make that deter-

mination and the defendant has a right to have that procedure followed so he can be heard in a meaningful manner before the judge who presided over the trial. See *Weil* v. *Neary,* 278 U.S. 160, 169, 49 S. Ct. 144, 73 L. Ed. 243 (1929); *Fowler* v. *Francis,* 362 P.2d 107, 108–109 (Okla. 1961).

## III

For several reasons, I also disagree with the majority's refusal to set aside the conviction of conspiracy to commit first degree robbery in the second count. First, it is clear that the state, before the case was submitted to the jury, intended to and did reduce the charge from conspiracy to commit robbery in the first degree; General Statutes § 53a-134 (a) (3); to conspiracy to commit robbery in the third degree; General Statutes § 53a-136. At the request of the assistant state's attorney and with the permission of the court, the state amended the information by deleting the words "in the first degree" and "armed" so the information submitted to the jury read that the defendant was accused of committing the crime of "conspiracy to commit robbery" instead of "conspiracy to commit robbery in the first degree."[4] Surely, with the permis-

[4] The information was amended when the following occurred:

"The Court: I will ask counsel to examine the information which I have here, as well as exhibit A.

"Mr. Maxwell [the assistant state's attorney]: Conspiracy to commit robbery, perhaps 'in the first degree' should be whited-out.

"The Court: Any problem with that, Mr. O'Toole [the assistant public defender]? I had indicated to them that the qualifying word 'armed' could be excluded. Why don't you white-out the word 'armed.'

"Mr. Maxwell: And first degree.

"The Court: Huh?

"Mr. Maxwell: Robbery in the first degree as well.

"The Court: Oh, you mean at the beginning of it?

"The Clerk: So it would be—

"Mr. Maxwell: Just as robbery, period." (Whereupon examination of the documents continued. Further comments not audible.)

sion of the court, the state may amend the information at any time before a verdict. Practice Book § 624; *State* v. *Jacobowitz,* 182 Conn. 585, 590, 438 A.2d 792 (1981). The majority's conclusion that it was not amended merely because the assistant state's attorney neglected to request that the statutory reference in the information be changed from § 53a-134 (a) (3) to § 53a-136 is without substance in view of the clear intent of the state, the defendant and the court.

Second, if the conspiracy count was in fact not amended to reduce the charge to conspiracy to commit robbery in the third degree, then the trial court committed error of a constitutional magnitude by failing to instruct the jury on an essential element of the crime.[5] In order to find the defendant guilty of conspiracy to commit robbery in the first degree under General Statutes § 53a-134 (a) (3), the jury was required to find proven that he conspired to commit robbery by using or threatening to use a dangerous instrument. *State* v. *Rouleau,* 204 Conn. 240, 258, 528 A.2d 343 (1987).

The trial court failed to instruct the jury on the essential element of conspiracy to commit robbery by the use or threatened use of a dangerous instrument and charged only on robbery. The jury was initially instructed on the conspiracy count as follows: "The second count of the information charges the defendant with the crime of conspiracy to commit robbery. . . .

---

[5] Whether it was preserved in the trial court, the defendant has a right to pursue this issue on appeal under *State* v. *Evans,* 165 Conn. 61, 327 A.2d 576 (1973), and *State* v. *Golding,* 213 Conn. 233, 567 A.2d 823 (1989). The defendant meets the following four requirements of *Evans* and *Golding:* "(1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." *State* v. *Golding,* supra, 239–40.

The first thing you must decide is did the accused perform an agreement or come to an agreement with one or more persons to commit the crime of robbery." Robbery was previously defined by the court, which satisfied only the requirement of robbery in the third degree and made no reference to a dangerous instrument.[6] Again, in its summary on the conspiracy count, the trial court, in part, charged: "To summarize then, in order to find the defendants guilty of conspiracy, you must conclude that the State has proved the following . . . elements beyond a reasonable doubt: First, the defendant entered into an agreement to engage in or cause the commission of the crime of robbery with Scott Ciak."

The trial court's reading of the original information (before its amendment), which merely recited that the crime with which the defendant was charged was "conspiracy to commit robbery in the first degree" and which made reference to the statutory designation of the crime, was insufficient to constitute an instruction on the dangerous instrument element. The jury would know, on the basis of these instructions, only that it was required to find the dangerous weapon element if it extrapolated the requirement from the instructions on the first count. This may be reasonable for persons trained in the law, but not for lay jurors. Failure to instruct the jury on the element of the dangerous instrument for the conspiracy count was a constitu-

---

[6] The trial judge instructed the jury on the definition of "robbery" as follows: "Robbery is generally defined under our law as follows: A person commits robbery, when in the course of committing a larceny, he uses or threatens the immediate use of physical force upon another person for the purpose of, one, preventing or overcoming resistance to the taking . . . [of] property, or to the retention thereof immediately after the taking, or two, compelling the owner of such property or another person, to deliver up the property or engage in other conduct which aids in the commission of larceny."

tional error, deprived the defendant of a fair trial and requires reversal. *State* v. *Golding,* 213 Conn. 233, 238, 567 A.2d 823 (1989).

Third, the majority conceded that the unloaded bb gun, the theory upon which the state prosecuted this case, could not satisfy the dangerous instrument element of the crime of robbery in the first degree in violation of General Statutes § 53a-134 (a) (3). Instead, the majority seeks to satisfy this element of the conspiracy count by relying upon the wielding of the tire iron by the second robber. The state, however, did not rely upon this theory in prosecuting its case. Moreover, although the tire iron theory was advanced by the state in a footnote to its appellate brief, it was withdrawn during appellate argument. It is clear that fundamental fairness requires that an appellate court be restricted to the theory on which the case was prosecuted in the trial court. See *Dunn* v. *United States,* 284 U.S. 390, 392, 52 S. Ct. 189, 76 L. Ed. 356 (1932); 24 C.J.S. Criminal Law § 1707. A defendant is entitled to be put on notice of the state's theory of prosecution at the trial level so that he or she can appropriately present a defense which includes effective cross-examination of witnesses.

In sum, I respectfully dissent except for that portion of the majority's decision that holds that the bb gun as used in this case could not constitute a dangerous instrument under the provisions of General Statutes § 53a-134 (a) (3).