******************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.
******************************************

# STATE OF CONNECTICUT *v.* DENNIS G. HAZARD
## (AC 43384)

DiPentima, C. J., and Moll and Harper, Js.*

*Syllabus*

Convicted of the crime of robbery in the first degree, the defendant appealed, claiming, inter alia, that the evidence was insufficient to establish his identity as the perpetrator and that he proved his affirmative defense of inoperability of the weapon used during the robbery. The perpetrator had pointed a gun at the employee on duty at a storage facility, took cash from her and then fled. Police officers searching the nearby area encountered a vehicle that came toward them but then reversed direction and left the area before crashing in a yard. The defendant fled from the crash scene before the police arrived and found cash, a gun and other items in the vehicle, which had been lent to the defendant by his girlfriend hours before the robbery. The storage facility employee described to the police what the defendant was wearing but was unable to identify him when the police brought her to a nearby store where he was arrested shortly after the robbery for a one-on-one identification. *Held*:

1. There was sufficient evidence from which the jury reasonably could have found that the defendant was the person who robbed the storage facility; the defendant owned and wore clothing and items similar to that worn by the perpetrator, some of which the police found in bushes near the crime scene and which contained the defendant's DNA, video surveillance showed an individual driving to a bush in a vehicle matching that which was owned by the defendant's girlfriend, exiting the vehicle and retreating behind the bush before returning to the vehicle wearing clothing that matched that of the defendant at the time of his arrest, and the police found in the vehicle, which belonged to the defendant's girlfriend, a gun and money that approximated the amount stolen from the storage facility.

2. The defendant could not prevail on his claim that his conviction of first degree robbery should be reversed because he proved the affirmative defense that the gun was inoperable at the time of the robbery; there was no evidence provided during the trial that addressed the operability of the gun at the time of the robbery, contrary to the defendant's claim that it was reasonable to infer that the gun was in the same condition at the time of the robbery as it was when the police tested it six months later and found it unable to discharge, the police officer who tested the gun was unable to testify about its operability prior to its recovery by the police or to state whether dirt found in the gun was the same type of dirt that was found on the defendant's clothes at the time of his arrest or the type of dirt that surrounded the items found in the bushes, the jurors were free to infer that the gun was not in the same condition at the time of testing as it was during the robbery, and, accordingly, the jury reasonably could have found that the defendant failed to prove his affirmative defense of inoperability.

3. The trial court did not abuse its discretion when it denied the defendant's motion for a mistrial, which was based on his claim that a police officer's testimony constituted improper lay opinion under the applicable provision of the Connecticut Code of Evidence (§ 7-1) and an improper opinion on the ultimate issue of identity in violation of the applicable provision of the Connecticut Code of Evidence (§ 7-3):

   a. The police officer's testimony that the defendant's clothing appeared to be the same as that worn by the perpetrator in the surveillance footage did not constitute an improper lay opinion, as nonexpert opinion testimony about the appearance of persons or things was admissible in the discretion of the court.

   b. The police officer did not give an opinion on the ultimate issue of identity when she testified that the defendant was wearing pants similar to those of the perpetrator in the surveillance video and that the defendant was the individual seen at the storage facility in that surveillance video; the trial court ordered the identification testimony stricken from the record and instructed the jurors twice not to consider it in their

deliberations, the defendant did not demonstrate that the stricken testimony was so prejudicial that the jury could not reasonably be presumed to have disregarded it, and, even if the identification testimony was improper, this court was not persuaded that it was harmful, as the jury was presented with significant other circumstantial evidence that connected the defendant to the robbery and provided a reasonable basis on which to conclude that he was the individual in the surveillance footage.

4. The defendant could not prevail on his claim that the trial court erred in failing to give the jury his requested instruction on identity, as the case did not involve issues of misidentification or lack of clarity and inconsistencies in identification, the jury instructions that were given were not incorrect, insufficient or misleading to the jury, and the defendant's reliance on the requirement that juries be given specific instructions with regard to eyewitness identifications was unavailing, as the sole potential eyewitness to the robbery was unable to identify the defendant.

Argued May 18—officially released October 27, 2020

*Procedural History*

Two part substitute information charging the defendant, in the first part, with the crimes of robbery in the first degree and robbery in the second degree, and, in the second part, with being a persistent dangerous felony offender, brought to the Superior Court in the judicial district of Ansonia-Milford, where the first part of the information was tried to the jury before *Brown, J.*; thereafter, the court denied the defendant's motion for a mistrial; verdict of guilty; subsequently, the defendant was presented to the court on a plea of guilty to the second part of the information; thereafter, the court denied the defendant's motions for a judgment of acquittal and for a new trial, vacated the verdict of guilty of robbery in the second degree, and rendered judgment in accordance with the verdict and the plea, and the defendant appealed. *Affirmed.*

*James B. Streeto*, senior assistant public defender, with whom was *Susan Brown*, public defender, for the appellant (defendant).

*Jonathan M. Sousa*, deputy assistant state's attorney, with whom, on the brief, were *Margaret E. Kelley*, state's attorney, and *Cornelius P. Kelly*, supervisory assistant state's attorney, for the appellee (state).

*Opinion*

HARPER, J. The defendant, Dennis G. Hazard, appeals from the judgment of conviction, rendered after a jury trial, of robbery in the first degree in violation of General Statutes § 53a-134 (a) (4).[1] On appeal, the defendant claims that (1) there was insufficient evidence to establish his identity as the person who committed the robbery, (2) he established the affirmative defense of inoperability of a gun that was found in the car he had been driving, (3) the trial court erred in denying his motion for a mistrial, and (4) the trial court erred in failing to give the jury his requested instruction on identification. We disagree with the defendant and, accordingly, affirm the judgment of the trial court.

The following facts, which the jury reasonably could have found, and procedural history are relevant to this appeal. On May 5, 2016, at or about 12:06 p.m., a robbery occurred at the Public Storage (storage facility) on Bull Hill Lane in West Haven. Renae Luginbuhl was the sole storage facility employee on duty at that time. The perpetrator was described as an African-American man wearing a dark hooded sweatshirt with a portion of a white undershirt hanging out, a baseball cap with a yellow brim and a light colored emblem, dark pants, and dark shoes with white soles. Upon entering the storage facility, the man mumbled something that Luginbuhl did not understand. Then the man pointed a gun at Luginbuhl and stated, "give me all your fucking money." Luginbuhl gave the man all of the money in the register and, additionally, the $50 and $100 bills she stored underneath the register. After receiving the money, the man warned Luginbuhl not to call anyone and then fled.

As soon as the man left the storage facility, Luginbuhl reported the robbery to the police. She described to the police what the man was wearing and informed them that the man had run across Bull Hill Lane. Luginbuhl, however, was unable to describe the man's facial features.

Detectives William Conlan and Craig Casman of the West Haven Police Department were among the first police officers to respond to the scene. They arrived at or about 12:24 p.m., in an unmarked vehicle, and searched the immediate area surrounding the storage facility, including a nearby dirt access road behind the Orange Landing Condominiums complex (complex). Once behind the complex, Conlan and Casman encountered a white or tan Chevy Malibu (vehicle) with a partially open passenger side door driving toward them from the opposite direction. At or about 12:25 p.m., the driver of the vehicle reversed direction and exited the access road, only to head north on Bull Hill Lane. Suspicious of the driver's actions, Conlan directed other police officers to stop the vehicle. Officer Minh Pham spotted the vehicle and began pursuit. Pham observed

that the driver of the vehicle was a black man with a distinctive haircut. Pham also observed the man driving erratically throughout Bull Hill Lane, Knight Lane, and then Valley Brook Road, where the vehicle hit stop signs, mailboxes, a utility pole, and ultimately crashed in a backyard on Valley Brook Road. By the time Pham arrived at the scene of the crash, the driver had exited the vehicle and escaped on foot.

Contemporaneous with Pham's pursuit of the vehicle, Detectives Sean Faughnan and Tammy Murray, along with Officer Justin Standish and his tracking dog, Cody, arrived at the storage facility to investigate. Standish directed Cody to the front door of the storage facility, where Cody picked up the scent of the perpetrator and, thereafter, led Standish across Bull Hill Lane and toward the complex. Once Standish and Cody reached the area of the complex, Cody lost the scent of the perpetrator. The police, however, found a black sweatshirt and baseball cap, similar to the one worn by the perpetrator, hidden in a bush by the complex. Thereafter, Faughnan, Murray, and Standish decided to continue their search at the crash site on Valley Brook Road, approximately two minutes away from the complex. They searched the vehicle and found approximately $479 scattered loosely over the floor of the passenger seat, a black revolver style pellet gun, two cell phones, and a pair of white sneakers.

While at the scene of the crash, Standish prepared Cody to continue tracking by using the scent obtained from the front seat of the vehicle. Cody began leading the officers on a scent trail from the crash site to a nearby parking lot where several construction workers reported seeing a black male running. From there, Cody led the officers across Carlson Road, up a short access road, and then toward a Dollar Tree store (store) on Boston Post Road in Orange.

A black male, later identified as the defendant, entered the store at or about 12:33 p.m. and was observed not wearing shoes. The defendant asked Stacey Sorrells, a store employee, if shoes were sold in the store, and she directed him to the area where he could purchase flip-flops. The defendant picked out a pair of flip-flops and, while checking out with a cashier, kept looking out the window and tapping his fingers. Upon completing his transaction, the defendant went to leave; however, after observing several police officers approaching the store at or about 12:36 p.m., he turned around and walked further into the store. Once Cody had entered the store, at or about 12:37 p.m., he led Standish past the other officers, employees, and customers, and alerted Standish to the defendant. The defendant was arrested and escorted from the store at or about 12:44 p.m.

At the time of his arrest, the defendant was wearing a blue and white shirt, jeans, and socks covered in

dirt or mulch. Shortly after his arrest, Luginbuhl was brought to the store by the police in order to make an identification; however, she was unable to identify the defendant as the person who robbed the storage facility.

Following his arrest, the defendant was charged with robbery in the first degree and robbery in the second degree. The trial began on November 28, 2017, and concluded December 5, 2017. On November 30, 2017, the state called Detective Murray, who testified, among other things, that the perpetrator was wearing the same clothing as the defendant at the time of his arrest and that the defendant was the perpetrator on the surveillance footage at the storage facility. Immediately following Murray's statement, the defendant orally moved for a mistrial, arguing that Murray's testimony was irreparably prejudicial. That motion was denied. On December 4, 2017, the defendant filed a written motion for a mistrial, challenging the court's rulings regarding allegedly prejudicial statements made by Murray. That motion was denied. Following the jury trial, on December 6, 2017, the defendant was found guilty of robbery in the first degree and robbery in the second degree.

Two months later, on February 8, 2018, the defendant filed a motion for a judgment of acquittal, arguing that the evidence adduced at trial did not reasonably permit a finding of guilty beyond a reasonable doubt. He also filed, that same day, a motion for a new trial. Specifically, he argued that (1) the court erred when it allowed testimony by Murray that the pants the perpetrator had worn and the pants the defendant had worn at the time of his arrest were the same pants, (2) Murray had testified erroneously about an essential element of the crime charged, (3) the court improperly denied the defendant's request for a mistrial on the basis of that issue, and (4) the court refused to instruct the jury on the issue of making an identification based on clothing. The court denied both of the defendant's motions.

On February 16, 2018, the court sentenced the defendant to a total effective term of twenty-eight years of incarceration, execution suspended after fifteen years, followed by five years of probation. On March 21, 2018, the defendant filed another motion for a judgment of acquittal and a new trial, arguing that the verdict of guilty of both robbery in the first degree and robbery in the second degree was legally inconsistent. More specifically, he argued that the difference between first and second degree robbery was the issue of the operability of the firearm and that a firearm cannot simultaneously be operable and inoperable. The defendant's motion was denied.[2] This appeal followed. Additional facts will be set forth as necessary.

## I

The defendant first claims that the evidence of identity was insufficient to sustain his conviction, and that

the trial court erred in denying his motion for a judgment of acquittal. The state counters that the cumulative impact of all the evidence and the inferences the jury reasonably could have drawn therefrom support the jury's finding that the defendant was the perpetrator. We agree with the state.

We begin our analysis by setting forth the well settled standard of review applicable to a sufficiency of the evidence claim, wherein we apply a two part test. "First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [jury] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt . . . . This court cannot substitute its own judgment for that of the jury if there is sufficient evidence to support the jury's verdict. . . .

"[T]he jury must find every element proven beyond a reasonable doubt in order to find the defendant guilty of the charged offense, [but] each of the basic and inferred facts underlying those conclusions need not be proved beyond a reasonable doubt. . . . If it is reasonable and logical for the jury to conclude that a basic fact or an inferred fact is true, the jury is permitted to consider the fact proven and may consider it in combination with other proven facts in determining whether the cumulative effect of all the evidence proves the defendant guilty of all the elements of the crime charged beyond a reasonable doubt. . . .

"Moreover, it does not diminish the probative force of the evidence that it consists, in whole or in part, of evidence that is circumstantial rather than direct. . . . It is not one fact . . . but the cumulative impact of a multitude of facts which establishes guilt in a case involving substantial circumstantial evidence. . . . In evaluating evidence, the [jury] is not required to accept as dispositive those inferences that are consistent with the defendant's innocence. . . . The [jury] may draw whatever inferences from the evidence or facts established by the evidence [that] it deems to be reasonable and logical. . . .

"[T]here is a fine line between the making of reasonable inferences and engaging in speculation—the jury is allowed only to do the former. . . . However, [t]he line between permissible inference and impermissible speculation is not always easy to discern. When we infer, we derive a conclusion from proven facts because such considerations as experience, or history, or science have demonstrated that there is a likely correlation between those facts and the conclusion. If that correlation is sufficiently compelling, the inference is reasonable. But if the correlation between the facts and the conclusion is slight, or if a different conclusion is more closely correlated with the facts than the chosen conclu-

sion, the inference is less reasonable. At some point, the link between the facts and the conclusion becomes so tenuous that we call it speculation. When that point is reached is, frankly, a matter of judgment. . . .

"[P]roof of a material fact by inference from circumstantial evidence need not be so conclusive as to exclude every other hypothesis. It is sufficient if the evidence produces in the mind of the trier a reasonable belief in the probability of the existence of the material fact. . . . Thus, in determining whether the evidence supports a particular inference, we ask whether that inference is so unreasonable as to be unjustifiable. . . . In other words, an inference need not be compelled by the evidence; rather, the evidence need only be reasonably susceptible of such an inference. . . .

"Finally, on appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the jury's verdict of guilty." (Citations omitted; internal quotation marks omitted.) *State* v. *Richards*, 196 Conn. App. 387, 395–97, 229 A.3d 1157, cert. granted, 335 Conn. 931,      A.3d      (2020).

Additionally, "[r]eview of any claim of insufficiency of the evidence introduced to prove a violation of a criminal statute must necessarily begin with the skeletal requirements of what necessary elements the charged statute requires to be proved. . . . The state has the burden of proving beyond a reasonable doubt the defendant's identity as the perpetrator of the crime." (Citation omitted; internal quotation marks omitted.) *State* v. *Pugh*, 190 Conn. App. 794, 802–803, 212 A.3d 787, cert. denied, 333 Conn. 914, 217 A.3d 635 (2019). "[T]he issue of the identity of the defendant as [the] perpetrator of the robbery is one of fact for the jury." *State* v. *Morgan*, 274 Conn. 790, 798, 877 A.2d 739 (2005).

The defendant does not dispute that the storage facility was robbed. Rather, the defendant contends only that the evidence of his identity as the perpetrator was insufficient to support the jury's inference linking him to the crime. He contends that the evidence of identity was insufficient because (1) there was no eyewitness who identified him as the perpetrator, (2) there was no physical evidence that tied him to the storage facility, (3) there was no confession, and (4) there was no testimony from an informant. The defendant further argues that the state relied, in large part, on the use of a montage of surveillance footage—from the storage facility, the complex, and the store—that contained gaps in time, was of poor quality, and purportedly showed the defendant approaching, robbing, and fleeing the storage facility. He further contends that, by concluding that the person in the video is the defendant, the jury engaged in speculation. We conclude that there was sufficient evidence presented at trial to satisfy the state's burden

of proving identity and, ultimately, to support the defendant's conviction.

First, Luginbuhl testified that the perpetrator was an African-American man wearing a black hooded sweatshirt pulled over a baseball cap with a yellow brim and dark pants. The police investigating the robbery found a black hooded sweatshirt and a baseball cap with a yellow brim abandoned in a bush near the storage facility. Shanae Lucky, the defendant's girlfriend at the time, testified that the defendant owned a black hooded sweatshirt and a black hat with a yellow brim, and that both items of clothing looked similar to those found by the police near the storage facility. Furthermore, forensic analysis revealed that the defendant's "entire genetic profile" was detected and that he was "a potential contributor to the major DNA mixture profile" found on the sweatshirt and the cap that were found near the storage facility. Forensic analysis further revealed that the expected frequency of individuals who could be a contributor to the major DNA mixture profile from the hat is less than 1 in 7 billion in the African-American, Caucasian, and Hispanic populations, and that the expected frequency of individuals who could be a contributor to the major DNA mixture profile from the sweatshirt is less than approximately 1 in 6100 in the African-American population, approximately 1 in 5900 in the Caucasian population, and approximately 1 in 6500 in the Hispanic population.

Second, Lucky testified that, on the morning of May 5, 2016, a few hours prior to the robbery, she lent the defendant her tan 2002 Chevy Malibu so that he could get the front passenger door repaired, which, at that time, required tying a seat belt to the door in order to keep it closed. Conlan testified that, while both he and Casman were driving on a dirt access road close to the storage facility, they encountered a man driving a tan Chevy Malibu. According to Conlan, after the driver saw the officers, the driver began backing his car in the opposite direction. Conlan further testified that when the vehicle eventually turned around, he noticed that the passenger side door was partially open. Furthermore, he testified that the vehicle that crashed on Valley Brook Road was the same vehicle he and Casman encountered on the dirt access road.

Third, after the police commenced pursuit of the vehicle that subsequently crashed on Valley Brook Road, the vehicle was searched and the contents therein were inventoried. Murray testified that the contents of the car included, among other things, $479 that was loosely scattered over the floor of the passenger seat,[3] a black revolver style pellet gun, and white shoes. Additional forensic and DNA analysis revealed that the defendant could not be eliminated as a contributor to the DNA found on the trigger and handle grip of the gun that was found in the vehicle. Last, the defendant's fingerprints

matched those found on the vehicle.

Fourth, Officer Standish testified about the results of the deployment of his K-9 tracking dog, Cody. Specifically, Standish testified that, after he led Cody to the entrance of the public storage and "casted" Cody,[4] Cody led Standish out of the storage facility and south across Bull Hill Lane toward the complex. When Cody and Standish reached the area surrounding the complex, however, a loud noise from an adjacent construction site interrupted Cody's tracking. At that point, Standish had received information via his radio that the pursuit of the vehicle resulted in a crash on Valley Brook Road; therefore, he and Cody left the scene of the robbery to begin a search at the scene of the crash. He further testified that he had directed Cody to the scent on the vehicle's driver seat and that Cody then began to track that scent. According to Standish, Cody led a team of police officers past several construction workers, through several streets, and into the store where he alerted Standish to the defendant, indicating that the defendant was the source of the scent obtained by Cody from the driver's seat of the vehicle. As a result of Cody's tracking efforts, the defendant was located.

Fifth, as noted, surveillance camera footage collected from the day of the robbery from three primary locations—the storage facility, the complex, and the store—was presented to the jury. That footage was compiled and showed the following: The perpetrator was wearing a dark hooded sweatshirt, an undershirt with white on the bottom, a dark cap with a yellow emblem, dark pants with rips on the front and back, and dark colored shoes when he robbed the storage facility; an individual wearing clothing similar to that which the perpetrator wore during the robbery exited a tan Chevy Malibu, ran to a bushy area where the sweatshirt and cap were found, and then returned to the vehicle no longer wearing the sweatshirt or cap; when that individual emerged from the bushes, he was wearing a "two-toned" shirt that was dark on top and white on bottom and dark, ripped jeans; the defendant entered the store with no shoes, wearing a "two-toned" shirt and pants similar in color and pattern to those worn by the perpetrator; when buying flip-flops in the store, the defendant kept tapping his hand and looking out the window of the store; and, after completing his purchase, the defendant went to exit the store but then turned around and went further into the store until several police officers entered the store and arrested him. The clothes the defendant was wearing in the surveillance footage at the store, after having been tracked down by Cody, were the same clothes he was wearing earlier that day when he left Lucky's home.[5]

Last, the defendant's actions immediately following the robbery are indicative of his consciousness of guilt. "[Consciousness of guilt] is relevant to show the con-

duct of an accused . . . subsequent to an alleged criminal act, which may be inferred to have been influenced by the criminal act. . . . The state of mind which is characterized as guilty consciousness or consciousness of guilt is strong evidence that the person is indeed guilty . . . ." (Internal quotation marks omitted.) *State* v. *Crafter*, 198 Conn. App. 732, 744, 233 A.3d 1227 (2020). "Flight, when unexplained, tends to prove a consciousness of guilt. . . . Flight is a form of circumstantial evidence. . . . The probative value of evidence of flight depends upon all the facts and circumstances and is a question of fact for the jury." (Internal quotation marks omitted.) *State* v. *Grajales*, 181 Conn. App. 440, 448–49, 186 A.3d 1189, cert. denied, 329 Conn. 910, 186 A.3d 707 (2018). In the present case, the driver of a vehicle, which was similar to that owned by the defendant's girlfriend and lent to the defendant, was captured on surveillance footage reversing direction after the appearance of an unmarked police vehicle; that same vehicle was pursued by other police officers until it ultimately crashed a few streets away from the crime scene; the driver fled on foot; Cody, the tracking dog, followed the scent of the driver and led the police officers to the defendant in the store; and, the defendant, who originally was attempting to exit the store, upon seeing the police approach the store, turned around and went further into the store where he was subsequently arrested.

In support of his claim, the defendant relies on this court's decision in *State* v. *Billie*, 123 Conn. App. 690, 696, 2 A.3d 1034 (2010), and the dissenting opinion in *State* v. *Osman*, 21 Conn. App. 299, 573 A.2d 743 (1990) (*Berdon, J.*, dissenting in part and concurring in part), rev'd, 218 Conn. 432, 589 A.2d 1227 (1991), as well as our Supreme Court's decision in *State* v. *Osman*, 218 Conn. 432, 437, 589 A.2d 1227 (1991). The defendant's reliance on these cases is misplaced.

In *Billie*, an anonymous informant had notified the police of suspected criminal activity in an area known for drug trafficking. *State* v. *Billie*, supra, 123 Conn. App. 692. Specifically, "[t]he informant stated that he had witnessed a 'black male' placing narcotics underneath the rear porch of a certain house but did not provide any further information that could be used to identify the individual observed." Id. As a result, the police had removed all but one package of narcotics and set up surveillance over the area that the informant described. Id. Later that evening, the police noticed the defendant as he approached the porch and removed the hidden narcotics; shortly thereafter, he was arrested. Id., 693.

On appeal, the defendant in *Billie* argued that the state did not produce sufficient evidence to prove beyond a reasonable doubt that he possessed the narcotics that were removed previously by the police or

that he had the requisite intent to sell; this court agreed. Id., 694–95. Because the remaining narcotics were not on the defendant's person and because the defendant was not in exclusive possession of the premises, in order to obtain a conviction, the state needed to "show incriminating statements or circumstances that support an inference that [the defendant] knew of the presence of the narcotics and had control of them . . . ." (Internal quotation marks omitted.) Id., 698. The state argued that it met its burden because knowledge and control of the remaining narcotics could have been inferred from the correlation between the informant's observations and the defendant's actions. Id. This court was not persuaded: "[T]he . . . informant's statement to the . . . police was limited to his witnessing a 'black male' placing narcotics underneath the rear porch of a certain house. This general description alone, totally devoid of any additional identifying characteristics or traits, did not provide sufficient information for the jury reasonably to have concluded that the defendant was the individual observed by the informant. The individual observed very well may have been the defendant or just as readily a drug dealer or user hiding his stash of narcotics. The evidence simply does not make this clear. Thus, in the absence of additional identifying information, the jury could not have concluded that the defendant was the individual observed by the informant without resorting to speculation." (Footnote omitted.) Id., 698–99.

Similar to *Billie*, there was no eyewitness identification of the defendant in the present case; rather, a general description was provided to the police. Unlike in *Billie*, however, that description was not limited to the defendant's skin color or gender—it also included the clothing he was wearing at the time, the fact that he was armed with a gun, and an approximation of how much money was stolen from the storage facility. As previously noted, evidence was also presented to the jury that the defendant owned clothing similar to that of the perpetrator; the clothing worn by the perpetrator during the robbery was found near the crime scene and contained the defendant's "entire genetic profile"; a gun and an amount of money similar to that taken from the storage facility were found in the vehicle belonging to the defendant's girlfriend, who also testified that she had lent the defendant her vehicle earlier that day; and the police had pursued that vehicle from the area of the crime scene to where it eventually crashed, near the store where the defendant was arrested. Accordingly, unlike in *Billie*, there was additional identifying information, as set forth previously in this opinion, from which the jury could have concluded that the defendant was the perpetrator.

Equally unpersuasive is the defendant's reliance on the dissent in *State* v. *Osman*, supra, 21 Conn. App. 314, as well as our Supreme Court's decision in *State*

v. *Osman*, supra, 218 Conn. 437. In *Osman*, the defendant was convicted of robbery in the first degree and conspiracy to commit robbery in the first degree. *State* v. *Osman*, supra, 218 Conn. 433. The defendant appealed to this court, arguing that there was insufficient evidence to identify him as the perpetrator or as a conspirator in the robbery of a convenience store. A majority of this court disagreed with the defendant on his claim that the evidence was insufficient to find him guilty of robbery in the first degree, found that the evidence was nevertheless sufficient to find him guilty of robbery in the third degree in violation of General Statutes § 53a-133 and affirmed his conviction of conspiracy to commit robbery in the first degree. One judge dissented in part and concurred in part. *State* v. *Osman*, supra, 21 Conn. App. 314. Our Supreme Court, however, reversed the judgment of this court. *State* v. *Osman*, supra, 218 Conn. 437–38. The evidence presented at trial included the following: the defendant lived within two miles of the crime scene; the defendant possessed a pellet gun, a Halloween costume with red hair, and gray pants, all of which were similar to those described by the victims; the defendant tried to borrow money on the day of the robbery; the defendant and his accomplice were similar in height to the robbers; and, after the robbery had occurred, the defendant brought home an expensive stereo, leather jacket, and leather sneakers, despite having been unemployed. *State* v. *Osman*, supra, 21 Conn. App. 301–304.

In the present case, the defendant relies on the dissent in *Osman*, which opined that the conviction in *Osman* "was upheld on proof of identification based solely upon circumstantial evidence of mere similarities not bolstered by similarities of a distinctive nature that connect the defendant to the crime." *State* v. *Osman*, supra, 21 Conn. App. 314 (*Berdon*, *J.*, dissenting in part and concurring in part). Without citing to the dissent, our Supreme Court concluded, in a per curiam opinion, that the "cumulative effect of the evidence elicited at . . . trial was insufficient to establish beyond a reasonable doubt the defendant's identity . . . . To have arrived at its decision that the defendant was one of the robbers, the jury would have had to resort to speculation and conjecture and to have drawn unwarranted inferences from the facts presented." *State* v. *Osman*, supra, 218 Conn. 437.

From our review of the evidence presented at trial in the present case, we are not persuaded that there were just "mere similarities" without a "distinctive nature" that connected the defendant to the crime. On the contrary, unlike in *Osman*, the evidence in this case showed not only that the defendant owned clothing similar to that worn by the perpetrator, but also that clothing similar to that worn by the perpetrator was found abandoned in the bushes near the scene of the crime and that clothing contained the defendant's DNA.

Furthermore, video surveillance showed an individual driving up to the bush in a vehicle matching that which was owned by Lucky, exiting the vehicle and retreating behind the bush, and then returning to the vehicle wearing clothing matching that of the defendant at the time of his arrest. Additionally, as previously noted, a gun and an amount of money approximating the amount stolen from the storage facility were found near the scene of the crime, strewn in a vehicle belonging to Lucky, who had lent the defendant her vehicle several hours prior to the crime.

The defendant concludes his claim by making a series of arguments aimed at reviewing the evidence and arguing that, together, it demonstrates his innocence. He further argues that evidence necessary to convict him was not provided by the state. We are mindful, however, of our scope of review: "[W]e give deference not to the hypothesis of innocence posed by the defendant, but to the evidence and the reasonable inferences drawable therefrom that support the jury's determination of guilt. On appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the jury's verdict of guilty." (Internal quotation marks omitted.) *State* v. *Richards*, supra, 196 Conn. App. 407.

On the basis of the foregoing evidence presented at trial and mindful of our standard of review, we conclude that there was sufficient evidence from which the jury reasonably could have found beyond a reasonable doubt that the defendant was the person who robbed the storage facility.

## II

Next, the defendant claims that this court must reverse his conviction of robbery in the first degree because he established the affirmative defense of inoperability. The state contends that the defendant failed to satisfy his burden of proving the affirmative defense of inoperability by a preponderance of the evidence. We agree with the state.

The following legal principles are relevant to our disposition of this claim. "The state meets its burden of proof regarding robbery in the first degree by proving beyond a reasonable doubt that, inter alia, the defendant displayed or threatened the use of what he represented to be a firearm. . . . If the defendant so chooses and the evidence permits, he may assert the affirmative defense of inoperability. . . . Because inoperability is an affirmative defense, the defendant was required to raise and prove it by a preponderance of the evidence. . . . Proving the defense by a preponderance of the evidence results in a conviction of robbery in the second degree." (Citations omitted; internal quotation marks

omitted.) *State* v. *Seay*, 128 Conn. App. 518, 523 n.4, 16 A.3d 1278, cert. dismissed, 302 Conn. 907, 23 A.3d 1246 (2011); see also General Statutes § 53a-134 (a) (4). On appeal, the standard for reviewing the defendant's affirmative defense claim is the same standard used for a sufficiency of the evidence claim. See *State* v. *D'Antuono*, 186 Conn. 414, 421, 441 A.2d 846 (1982); see also part I of this opinion.

In this case, the jury necessarily found that the state met its burden of proving the elements of robbery in the first degree and that the defendant did not prove the affirmative defense of inoperability by a preponderance of the evidence. Evidence was presented during trial that a gun was used by the perpetrator during the robbery and that a gun later was found in the vehicle that the defendant had borrowed from his girlfriend. Shortly after the defendant's arrest, the gun was recovered from the passenger side floor of the vehicle, inventoried, and placed in the police evidence room. During trial, Detective Murray testified about a test that was performed to determine if the gun had been operable. Despite the three attempts that were made, the gun was unable to discharge, even after the cylinder in the gun was replaced. Murray was unable to testify about the operability of the gun prior to its recovery or during the robbery. In fact, there was no evidence provided during the trial that addressed the operability of the gun at the time of the robbery.

According to the defendant, the gun was seized on May 5, 2016, and tested on November 17, 2016. He argues that because it is reasonable to infer that the gun was stored in such a manner as to prevent deterioration, the only reasonable inference is that the gun was in the same condition on the day it was tested as it was during the robbery. We are not persuaded.

During trial, Murray testified that a close examination of the gun revealed that there was dirt inside of it. Murray, however, was unable to state whether the dirt found in the gun was the same type of dirt found on the defendant's clothes at the time of his arrest or if it was the same type of dirt that surrounded the sweatshirt and hat hidden in the bushes. Furthermore, evidence also was presented to the jury that the vehicle in which the gun was found crashed prior to the defendant's arrest. On the basis of the evidence presented at trial, the jurors were free to infer that the gun was not in the same condition at the time of testing as it was during the robbery. Regardless of the weight of that evidence, however, there was no evidence provided during the trial that addressed the operability of the gun at the time of the robbery. Accordingly, the jury reasonably could have found that the defendant failed to meet his burden of proving the affirmative defense of inoperability by a preponderance of the evidence.

In support of his claim, the defendant also cites to

*State* v. *Ortiz*, 71 Conn. App. 865, 804 A.2d 937, cert. denied, 261 Conn. 942, 808 A.2d 1136 (2002), and discusses *State* v. *Seay*, supra, 128 Conn. App. 518. Neither case assists him in this appeal.

In *Ortiz*, unlike in the present case, evidence showed that the gun at issue was inoperable both *before and after* the robbery. *State* v. *Ortiz*, supra, 71 Conn. App. 876. As previously noted, in the present case there was no evidence proffered at trial that addressed the operability of the gun before or during the robbery; therefore, *Ortiz* is inapposite.

The defendant also seems to make the same argument that the *Seay* defendant attempted to make—that because there was no evidence that the gun was operable, the defendant met his burden.[6] See *State* v. *Seay*, supra, 128 Conn. App. 523. In *Seay*, the defendant was convicted of robbery in the first degree after he robbed a liquor store. Id., 520. During the robbery, he had held a duffel bag with "some kind of firearm" inside but never actually removed it from the bag. Id. After the robbery, the police searched the defendant's property and found broken pieces of what, when put together, was described to be a " 'facsimile firearm' . . . ." Id., 524. Additionally, "[d]uring closing argument, the prosecutor suggested that the facsimile firearm likely was used by the defendant during the robbery."[7] Id.

On appeal, the defendant in *Seay* argued that his conviction of robbery in the first degree should be replaced by the lesser included offense of robbery in the second degree because he had met his burden of proving the affirmative defense of inoperability. Id., 523. More specifically, he argued that there was no evidence that the facsimile firearm was operable and that there was no evidence that a gun other than that one was used during the robbery. Id. Despite the prosecutor's argument that the facsimile firearm was likely the one used during the robbery, this court held that "[a]lthough the jury reasonably could have found that the firearm found by the police was the same item used by the defendant during the robbery, the jury was not obligated so to find. It was within the province of the jury not to believe . . . that the facsimile firearm found by the police was used by the defendant during the robbery. . . . We note that [the victim] did not testify that the facsimile firearm found by the police was the same weapon used during the robbery. Operability is not an element of robbery in the first degree. It was the defendant's burden to prove inoperability and the jury reasonably could have determined that the defendant had not proven the affirmative defense of inoperability by a preponderance of the evidence." Id., 524.

As previously noted, in the present case, there was no evidence presented that the gun was operable, which the state was not required to prove. There also, however, was no evidence that the gun was inoperable at

the time of the robbery, which the defendant was required to prove in order to meet his burden with respect to the affirmative defense of inoperability. The evidence presented to the jury was that the gun seized from the vehicle contained dirt, that it was found in the vehicle of the defendant's girlfriend after that vehicle was crashed by the defendant, and that the gun was inoperable several months after the robbery when it was tested by the police. Just as this court held in *Seay*, in the present case, it was within the province of the jury to disbelieve that the gun was inoperable during the robbery. Indeed, under *Seay*, the jury could have found that the gun recovered from the Chevy Malibu was not the same gun the defendant used during the robbery. The defendant offered no affirmative evidence that the firearm used during the robbery was inoperable. Accordingly, the jury reasonably could have determined that the defendant did not prove the affirmative defense of inoperability by a preponderance of the evidence.

### III

The defendant next claims that the trial court erred in denying his motion for a mistrial. Specifically, he contends that a mistrial should have been granted after Detective Murray testified that the defendant's clothing appeared to be the same as the perpetrator's and after she identified the defendant as the perpetrator in the surveillance footage. The defendant argues that such testimony constituted improper lay opinion under § 7-1 of the Connecticut Code of Evidence and an opinion on the ultimate issue of identity in violation of § 7-3 of the Connecticut Code of Evidence. The state argues that the trial court properly exercised its discretion and that, even if Murray's testimony was improper, it did not violate the defendant's right to a fair trial. We agree with the state.

We begin with our standard of review. "In our review of the denial of a motion for mistrial, we have recognized the broad discretion that is vested in the trial court to decide whether an occurrence at trial has so prejudiced a party that he or she can no longer receive a fair trial. The decision of the trial court is therefore reversible on appeal only if there has been an abuse of discretion." (Internal quotation marks omitted.) *State* v. *Montanez*, 185 Conn. App. 589, 602, 197 A.3d 959 (2018), cert. denied, 332 Conn. 907, 209 A.3d 643 (2019).

Additionally, "[t]o the extent [that] a trial court's admission of evidence is based on an interpretation of the Code of Evidence, our standard of review is plenary. . . . We review the trial court's decision to admit evidence, if premised on a correct view of the law, however, for an abuse of discretion. . . . It is axiomatic that [if premised on a correct view of the law, the] trial court's ruling on the admissibility of evidence is entitled to great deference. . . . In this regard, the trial court

is vested with wide discretion in determining the admissibility of evidence . . . . Accordingly, [t]he trial court's ruling on evidentiary matters will be overturned only upon a showing of a clear abuse of the court's discretion. . . . [I]n determining whether there has been an abuse of discretion, every reasonable presumption should be made in favor of the correctness of the trial court's ruling, and we will upset that ruling only for a manifest abuse of discretion." (Internal quotation marks omitted.) *State* v. *Petersen*, 196 Conn. App. 646, 663–64, 230 A.3d 696, cert. denied, 335 Conn. 921, 232 A.3d 1104 (2020).

The following facts are relevant to this claim. Murray testified about many facets of the case, including the defendant's attire as compared to that of the perpetrator portrayed in sequenced video surveillance footage. More specifically, during her testimony, she stated that "[t]his . . . footage from [the store] . . . shows an individual entering the store wearing no footwear and appearing to be clad in the same clothing that the individual in the footage from [the complex] was wearing." Murray then testified that the individual in the store was arrested and also identified the person who was arrested as being the defendant. Shortly thereafter, the state questioned Murray about the locations from which she obtained the defendant's fingerprints, including at the counter of the storage facility, to which Murray stated: "I did not process the [storage facility] counter for fingerprints because, in the video, you could see [the defendant] actually doesn't touch . . . ." Before Murray could finish her statement, defense counsel objected and asked that the statement be stricken from the record. The court ordered the statement stricken and admonished the jurors not to consider it in their deliberations. Following the remainder of Murray's testimony, defense counsel orally moved for a mistrial, arguing that Murray's statements were prejudicial, that they were induced by the state's witness, and that, because this is a case of identification, the incident was irreparable. The court, without explanation, denied the defendant's motion.

On December 5, 2017, defense counsel renewed his motion for a mistrial with respect to Murray's testimony that the perpetrator had worn the same clothing as that worn by the defendant. The court denied the defendant's motion. On February 9, 2018, prior to sentencing, defense counsel moved for a new trial, arguing, again, that Murray was unqualified to testify to the sameness or similarities of the perpetrator's clothing compared to that of the defendant's, and that she had testified to the ultimate issue of identity. The court denied the defendant's motion and provided the following reason: "[T]he defendant has not met the test under [§ 42-53] of the Practice Book, either . . . for an error by reason of which the defendant is constitutionally entitled to a new trial, or . . . for any other error which the defen-

dant can establish was materially injurious to him or her. . . . [T]hose standards have not been met."[8]

In his challenge to the court's denial of his motion for a mistrial, the defendant posits that Murray's testimony constituted improper lay opinion and an opinion on the ultimate issue of identity. We disagree and address both in turn.

A

Section 7-1 of the Connecticut Code of Evidence provides: "If a witness is not testifying as an expert, the witness may not testify in the form of an opinion, unless the opinion is rationally based on the perception of the witness and is helpful to a clear understanding of the testimony of the witness or the determination of a fact in issue." The defendant argues that Murray's testimony about the defendant's clothing represented layperson testimony and that Murray was not established as an expert in fashion or clothing.

Our Supreme Court analyzed § 7-1 extensively in *State* v. *Holley*, 327 Conn. 576, 175 A.3d 514 (2018). On appeal in that case, the defendant challenged the admission of testimony by the police that identified marks on the defendant's body as bite marks. Id., 604. The defendant claimed that this testimony violated § 7-1, arguing that the testifying officer was not an expert capable of making such an identification. Id., 607–608. In its analysis, the court recounted the language of § 7-1 and stated that "the commentary to the rule cites as illustrative matters upon which nonexpert opinion testimony has been held admissible include: the market value of property where the witness is the owner of the property . . . *the appearance of persons or things* . . . sound . . . the speed of an automobile . . . and physical or mental condition." (Emphasis in original; internal quotation marks omitted.) Id., 608–609. Our Supreme Court then proceeded to recount several cases in which it concluded that the challenged testimony constituted "the appearance of persons or things" and was, thus, admissible at the discretion of the trial court. Id., 609; see *State* v. *Schaffer*, 168 Conn. 309, 318–19, 362 A.2d 893 (1975) ("It is permissible to admit into evidence *the opinions of common observers in regard to common appearances*, facts and conditions . . . . [I]t is indispensable that the opinions be founded on their own personal observation, and not [on] the testimony of others, or on any hypothetical . . . ." (Citations omitted; emphasis added; internal quotation marks omitted.)).

Given our Supreme Court's conclusions in *Holley*, we are not persuaded that Murray's testimony, in the present case, as to the defendant's pants violated § 7-1.

B

We now address the defendant's claim that Murray's testimony constituted an opinion on the ultimate issue

of identity and that it was harmful. Section 7-3 (a) of the Connecticut Code of Evidence provides: "Testimony in the form of an opinion is inadmissible if it embraces an ultimate issue to be decided by the trier of fact, except that, other than as provided in subsection (b), an expert witness may give an opinion that embraces an ultimate issue where the trier of fact needs expert assistance in deciding the issue." The defendant argues that Murray's testimony that the defendant was wearing similar pants as the perpetrator and that the defendant was the individual at the storage facility counter on the surveillance footage went to the ultimate issue of identity. In support of his argument, he cites to *State v. Finan*, 275 Conn. 60, 881 A.2d 187 (2005). Specifically, he argues that our Supreme Court concluded in *Finan* that the identification of a perpetrator on the video surveillance was an ultimate issue for the jury and that the admission of testimony from four police officers as to that defendant's identity on the video was harmful error.

In *Finan*, our Supreme Court stated that an ultimate issue is characterized "as one that cannot reasonably be separated from the essence of the matter to be decided [by the trier of fact]." (Internal quotation marks omitted.) Id., 66. The court concluded that, on the facts of the case, "the identification of the defendant as one of the perpetrators shown on the videotape was an ultimate issue . . . ." Id., 67. The court further concluded that "[t]he identification of the defendant . . . on the videotape was fundamental to the jury's conclusion that the defendant was one of the perpetrators of the robbery. Accordingly . . . [it was] improperly determined that the lay witness testimony [of the four police officers] correctly was admitted." Id., 68–69.

Even if we assume that Murray's statement identifying the defendant was improper opinion testimony, we are not persuaded that it was harmful. "In order to establish reversible error on an evidentiary impropriety . . . the defendant must prove both an abuse of discretion and a harm that resulted from such abuse. . . . When an [evidentiary impropriety] . . . is not constitutional in nature, the defendant bears the burden of demonstrating that the error was harmful. . . . [W]hether [the improper admission of a witness' testimony] is harmless in a particular case depends upon a number of factors, such as the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case. . . . Accordingly, a nonconstitutional error is harmless when an appellate court has a fair assurance that the error did not substantially affect the verdict." (Citations omitted; internal quotation marks omitted.) *State* v. *Bermudez*, 195 Conn. App.

780, 797, 228 A.3d 96, cert. granted on other grounds, 335 Conn. 908, 227 A.3d 521 (2020).

It is noteworthy that, after Murray identified the person in the surveillance footage as the defendant, defense counsel objected immediately, and the court ordered the statement stricken from the record. Additionally, the court admonished the jurors and instructed them, twice, to disregard Murray's statement and not to consider it in their deliberations. "If curative action can obviate the prejudice, the drastic remedy of a mistrial should be avoided. . . . [A]s a general matter, the jury is presumed to follow the court's curative instructions in the absence of some indication to the contrary. . . . [T]he burden is on the defendant to establish that, in the context of the proceedings as a whole, the stricken testimony was so prejudicial, notwithstanding the court's curative instructions, that the jury reasonably cannot be presumed to have disregarded it." (Citations omitted; internal quotation marks omitted.) *State v. Gonzalez*, 167 Conn. App. 298, 302–303, 142 A.3d 1227, cert. denied, 323 Conn. 929, 149 A.3d 500 (2016).

Furthermore, the jury in this case, unlike in *Finan*, was presented with significant other circumstantial evidence that connected the defendant to the robbery, separate and distinct from that of Murray's singular stricken statement. See part I of this opinion. That other evidence, taken together, provided the jury with a reasonable basis on which to conclude that the defendant was the individual in the surveillance footage. Additionally, the defendant has not demonstrated that the stricken testimony was so prejudicial that the jury reasonably cannot be presumed to have disregarded it.

Accordingly, we conclude that the trial court did not abuse its discretion in denying the defendant's motion for a mistrial.

IV

Last, the defendant claims that the court erred in failing to give the jury his requested instruction on identification. More specifically, the defendant argues that the requested instruction was crucial to his defense of misidentification and to the central issue of identification. We disagree.

The following additional facts are relevant to this claim. With regard to identity, the court gave the jury the following instruction: "The state has the burden of proving beyond a reasonable doubt that the defendant was the perpetrator of the crime. You, the jury, must be satisfied beyond a reasonable doubt that the defendant was the perpetrator of the crime or you must find the defendant not guilty. The defendant denies that he is the person who was involved in the commission of the alleged offense." The court's instruction is only a portion of what the defendant had requested; specifically, the defendant requested that the court include

the following additional language as part of its identity instruction: "If you have a reasonable doubt as to the accuracy of the identification, you must find the defendant not guilty. . . . In this case, Renae Luginbuhl, the employee at the Public Storage, and the only person in the facility at the time of the incident . . . did not identify [the defendant] as the perpetrator of this offense. In a one-on-one identification procedure, she did not make an identification."

We turn now to the relevant legal principles that guide our review of this claim. "It is a well established principle that a defendant is entitled to have the jury correctly and adequately instructed on the pertinent principles of substantive law. . . . The primary purpose of the charge to the jury is to assist [it] in applying the law correctly to the facts which [it] find[s] to be established." (Citations omitted; internal quotation marks omitted.) *State* v. *Ortiz*, 252 Conn. 533, 560–61, 747 A.2d 487 (2000). "[T]he test of a court's charge is not whether it is as accurate upon legal principles as the opinions of a court of last resort but whether it fairly presents the case to the jury in such a way that injustice is not done to either party under the established rules of law. . . . As long as [the instructions] are correct in law, adapted to the issues and sufficient for the guidance of the jury . . . we will not view the instructions as improper." (Internal quotation marks omitted.) *State* v. *Leroy*, 232 Conn. 1, 8, 653 A.2d 161 (1995).

"Our Supreme Court has held that identification instructions are not constitutionally required and [e]ven if [a] court's instructions were less informative on the risks of misidentification . . . the issue is at most one of instructional error rather than constitutional error. A new trial would only be warranted, therefore, if the defendant could establish that it was reasonably probable that the jury was misled. . . . The ultimate test of a court's instructions is whether, taken as a whole, they fairly and adequately present the case to a jury in such a way that injustice is not done to either party under the established rules of law. . . .

"We review nonconstitutional claims of instructional error under the following standard. While a request to charge that is relevant to the issues in a case and that accurately states the applicable law must be honored, a [trial] court need not tailor its charge to the precise letter of such a request. . . . If a requested charge is in substance given, the [trial] court's failure to give a charge in exact conformance with the words of the request will not constitute a ground for reversal. . . . As long as [the instructions] are correct in law, adapted to the issues and sufficient for the guidance of the jury . . . we will not view the instructions as improper." (Citation omitted; internal quotation marks omitted.) *State* v. *Crosby*, 182 Conn. App. 373, 410–11, 190 A.3d

1, cert. denied, 330 Conn. 911, 193 A.3d 559 (2018). "A challenge to the validity of jury instructions presents a question of law over which this court has plenary review." (Internal quotation marks omitted.) Id., 411. "Significantly, our Supreme Court [has] . . . emphasized that a trial court retains the discretion to decide whether, under the specific facts and circumstances presented, focused and informative jury instructions on eyewitness testimony are warranted. . . . In reviewing the discretionary determinations of a trial court, every reasonable presumption should be given in favor of the correctness of the court's ruling." (Internal quotation marks omitted.) Id., 416.

The defendant cites two cases in support of his claim. First, he relies on our Supreme Court's holding in *State* v. *Cerilli*, 222 Conn. 556, 567, 610 A.2d 1130 (1992), that a "specific instruction on identification was warranted because [the defendant's] theory of defense was misidentification and because there were sufficient instances of lack of clarity and sufficient inconsistencies in the identification testimony of the victim and [a witness]." Because the present case did not involve issues of misidentification or a lack of clarity and sufficient inconsistencies in identification, we conclude that the defendant's reliance on *Cerilli* is misplaced.[9]

Second, the defendant relies on our Supreme Court's analysis in *State* v. *Guilbert*, 306 Conn. 218, 246, 49 A.3d 705 (2012). Specifically, he emphasizes the court's focus on the scientific developments as to eyewitness identification instructions and that instructions reflecting the substance of those scientific findings were important to assuring a fair trial. He also relies on the court's conclusion in *Guilbert* that "a trial court retains the discretion to decide whether, under the specific facts and circumstances presented, focused and informative jury instructions on the fallibility of eyewitness identification evidence . . . would alone be adequate to aid the jury in evaluating the eyewitness identification at issue. . . . [A]ny such instructions should reflect the findings and conclusions of the relevant scientific literature pertaining to the particular variable or variables at issue in the case; *broad, generalized instructions on eyewitness identifications . . . do not suffice.*" (Citations omitted; emphasis added; footnote omitted.) Id., 257–58.

This court, however, already has concluded that "*Guilbert* concerned the admissibility of expert testimony, *not a challenge to jury instructions*. Although the court in *Guilbert* did acknowledge the widespread judicial recognition that eyewitness identifications are potentially unreliable in a variety of ways unknown to the average juror . . . it did not mandate that such factors be included in jury instructions." (Citation omitted; emphasis added; internal quotation marks omitted.) *State* v. *Crosby*, supra, 182 Conn. App. 411–12. Addition-

ally, to the extent that *Guilbert* requires more specific jury instructions with regard to eyewitness identifications, we find the defendant's reliance thereon unavailing because, in the present case, *there were no eyewitness identifications*. As previously noted, the sole potential eyewitness was unable to identify the defendant.

After our careful review of the evidence and the jury instructions, we cannot conclude that those instructions were incorrect, insufficient, or misleading to the jury.

The judgment is affirmed.

In this opinion the other judges concurred.

* The listing of judges reflects their seniority status on this court as of the date of oral argument.

[1] General Statutes § 53a-134 (a) provides in relevant part: "A person is guilty of robbery in the first degree when, in the course of the commission of the crime of robbery as defined in section 53a-133 or of immediate flight therefrom, he or another participant in the crime . . . (4) displays or threatens the use of what he represents by his words or conduct to be a pistol, revolver, rifle, shotgun, machine gun or other firearm, except that in any prosecution under this subdivision, it is an affirmative defense that such pistol, revolver, rifle, shotgun, machine gun or other firearm was not a weapon from which a shot could be discharged. . . ."

The jury also found the defendant guilty of robbery in the second degree in violation of General Statutes § 53a-135 (a) (1) (B). The court, however, vacated the defendant's conviction of robbery in the second degree because it concluded that a conviction of first and second degree robbery would violate the prohibition against double jeopardy.

[2] Consistent with Connecticut case law, we conclude that the trial court should have dismissed rather than denied the defendant's March 21, 2018 motion for acquittal and a new trial due to lack of jurisdiction. See *State* v. *McCoy*, 331 Conn. 561, 586–87, 206 A.3d 725 (2019) ("a trial court loses jurisdiction once the defendant's sentence is executed, unless there is a constitutional or legislative grant of authority").

[3] Luginbuhl did not recall the exact amount of money stolen from the storage facility. She testified that she began the day with $250 in a drawer and gave the robber what was in the drawer, plus the $50 and $100 bills that she kept underneath the drawer. During cross-examination, defense counsel showed Luginbuhl a report she had given to the police indicating the amount of money stolen. After reading the report, she testified that there was $347 underneath the register. She did not clearly state, however, the total amount of money inside the drawer, including the original $250. To the extent that there is a discrepancy with regard to the amount of money found in the vehicle as compared to that having been taken from the storage facility, this court has held that "a possible discrepancy in the evidence does not necessarily outweigh the evidence tending to show guilt." *State* v. *Ingram*, 132 Conn. App. 385, 392, 31 A.3d 835 (2011), cert. denied, 303 Conn. 932, 36 A.3d 694 (2012).

[4] "Casting" is the process of bringing a trained tracking dog to an area where a suspect was last seen in order to have the dog pick up the suspect's scent.

[5] The defendant contends that the surveillance footage is unreliable. Specifically, he argues that the footage contained inaccurate time stamps and that to render any conclusions therefrom would require speculation. He further argues that, because the time stamps are inaccurate, "it cannot be said, without speculation, that they show events happening at or around the time of the robbery." We find the defendant's arguments unavailing.

During trial, Detective Murray testified that the surveillance footage from 155 Bull Hill Lane—the footage covering the back service road area—"was approximately five hours and twenty minutes later than what the time is on the display. So, the time would say, like, 06:45 because it's in military time, but it's actually at five hours and twenty minutes [later] . . . ." Murray further testified that the "video from 157 Bull Hill Lane that—the actual time with respect to that video is actually three minutes later than the display time. So, if it says 12:07, [then] the video was actually 12:10." Murray's

testimony, which the jury was free to accept, clarified the time stamps provided to the jury and, furthermore, established that the robbery of the storage facility, the pursuit of the Chevy Malibu, and the arrest of the defendant all took place between 12:05 and 12:45 p.m.

[6] The defendant argues in his brief that *Seay* should be overruled. As we have often stated, however, "[i]t is axiomatic that one panel of this court cannot overrule the precedent established by a previous panel's holding. . . . The reversal may be accomplished only if the appeal is heard en banc." (Citation omitted; internal quotation marks omitted.) *State* v. *Carlos P.*, 171 Conn. App. 530, 545 n.12, 157 A.3d 723, cert. denied, 325 Conn. 912, 158 A.3d 321 (2017); see also Practice Book § 70-7.

[7] In *Seay*, the prosecutor argued that "[w]e've introduced a facsimile firearm into evidence. We can't prove beyond a reasonable doubt that that's the one that's in the bag, but it's a reasonable likelihood that that is the one that was in the bag. I think common sense would tell you that that probably was." (Internal quotation marks omitted.) *State* v. *Seay*, supra, 128 Conn. App. 524.

[8] Practice Book § 42-53 provides in relevant part: "(a) Upon motion of the defendant, the judicial authority may grant a new trial if it is required in the interests of justice. Unless the defendant's noncompliance with these rules or with other requirements of law bars his or her asserting the error, the judicial authority shall grant the motion:

"(1) For an error by reason of which the defendant is constitutionally entitled to a new trial; or

"(2) For any other error which the defendant can establish was materially injurious to him or her. . . ."

[9] In *Cerilli*, our Supreme Court concluded that a specific identification instruction was necessary because the defendant's theory of defense was misidentification and, as noted, there were inconsistencies and a lack of clarity in the identification testimony. *State* v. *Cerilli*, supra, 222 Conn. 567. Specifically, the victim "[i]n a forty-two page typewritten statement given to the police on October 26, 1987 . . . described her assailant as a white man between 5'10" and 6' tall, a little flabby or pouchy, thirty-five to forty years old or older. She described his skin as having 'little holes and cratering in his face,' and she stated that the blemishes on his face 'looked like somebody had acne.' In response to the question by the police whether it was '[h]eavy acne or just light acne?' she responded, 'Yeah, and they was red.' In response to the question, 'Red in complexion?' she responded, 'Mm hmm, real pale.' In this statement, the victim described the assailant's hair as 'long, dark . . . brown . . . feathered up . . . and it came down to about his shoulders [and] neck and he had it curled . . . .' She also described it as 'real dark brown, almost . . . black' with 'light brown, brown/blond . . . streaks . . . mixed in . . . .' She described his nose as 'funny shape[d],' 'real round . . . skinny and . . . round, real curved . . . pointed at the end . . . .' " Id., 564 n.6. Further, "[s]he described his car as dark brown, square, with a light tan interior, and with nothing unusual about the rearview mirror." Id. During trial, however, the victim described the defendant as follows: "[T]he assailant [had], inter alia, acne and a pock-marked face, and a prominent, hawk-like nose." Id. Additionally, "[s]he . . . recalled describing the assailant's car as dark brown with a tan interior and a vinyl roof." Id. Another witness, however, prior to trial, described the defendant as "having light brown or blond curly hair that reached down to about his neckline and was combed back. She described his face as having 'little holes' in it that looked 'like craters,' and his nose as 'funny shaped.' " Id.

Unlike *Cerilli*, in the present case, there was a single and consistent description by Luginbuhl as to what the perpetrator was wearing during the commission of the crime. Additionally, Luginbuhl was unable to describe the facial features or other physical characteristics of the perpetrator; rather, she provided only a description of his clothing. Accordingly, we conclude that the factual scenario underlying our Supreme Court's decision to require a more specific jury instruction on identification in *Cerilli* is inapplicable in the present case.